[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15347

_____

D.C. Docket No. 1:12-cv-00162-MP-CAS

ALICE FRAME,

Plaintiff–Appellant,

versus

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant–Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 13, 2015)

Before ED CARNES, Chief Judge, DUBINA and GILMAN,[*] Circuit Judges.

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

PER CURIAM:

Alice Frame appeals the district court's affirmance of the decision by the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income. After carefully reviewing the record, and after reading the parties' briefs, we affirm.[1]

## I.

In June 2006, Frame filed an application for social security disability benefits. After her application was denied, she sought judicial review of the Commissioner's decision in federal court. At the Commissioner's request, the district court remanded her application to the Appeals Council under sentence four of 42 U.S.C. § 405(g).

In March 2012, following a hearing on Frame's application, the administrative law judge ("ALJ") concluded that she was not disabled and denied her benefits claims. Because the Appeals Council did not assume jurisdiction, the ALJ's decision became the Commissioner's final decision and is thus subject to judicial review. *See* 20 C.F.R. §§ 404.984, 416.1484.

Once more, Frame sought judicial review of the denial of her benefits application. The district court affirmed the ALJ's decision. This appeal followed.

---

[1] Though originally scheduled for oral argument, this appeal was removed from the oral-argument calendar by unanimous agreement of the panel. *See* 11th Cir. R. 34-3(f).

## II.

In social security appeals, we review de novo the district court's judgment regarding whether substantial evidence exists to support the Commissioner's final decision. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). During this review, we do not reweigh the evidence, decide facts anew, make credibility determinations, or substitute our judgment for the ALJ's. *Id.* at 1211, 1213. The ALJ's factual findings are conclusive if supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means more than a scintilla but less than a preponderance; it is enough "relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)) (internal quotation mark omitted). In the end, so long as substantial evidence exists, we must affirm the ALJ's decision even if the evidence preponderates against it. *Id.* at 1158–59.

## III.

The Social Security Act makes disability insurance benefits and supplemental security income available to a claimant who is "under a disability" or "disabled." 42 U.S.C. §§ 423(a), 1382(a). The Act defines *disability* and *disabled* as being "unable to engage in any substantial gainful activity" because of a "medically determinable physical or mental impairment" that is expected to result in death or that has lasted (or is expected to last) for at least 12 straight months. *Id.* §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

3

A claimant seeking social security disability benefits must prove that she is disabled. *Moore*, 405 F.3d at 1211. To do so, she must shoulder the "very heavy burden" of showing that she has "both a qualifying disability and an inability to perform past relevant work." *Id.*

To decide whether a claimant is disabled, the ALJ uses a "five-step sequential evaluation process." 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). Throughout this process, the claimant must introduce evidence to support her benefits application. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The evaluation moves from step to step until the ALJ finds that the claimant is either disabled or not disabled. §§ 404.1520(a)(4), 419.920(a)(4).

These are the steps in this process:

(1)  determine whether the claimant is currently engaged in substantial gainful activity;

(2)  determine whether the claimant's alleged impairment (or combination of impairments) is "severe";

(3)  determine whether the claimant's severe impairment satisfies or medically equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1;

(4)  determine whether the claimant has the residual functional capacity to perform past relevant work; and

(5)  determine whether the claimant can perform other work in the national economy given her residual functional capacity, age, education, and work experience.

§§ 404.1520(a)(4)(i)–(iv), 416.920(a)(4)(i)–(v).

To prevail at step three, the claimant must provide specific evidence—such as medical signs, symptoms, or laboratory-test results—showing that her

4

impairment meets or medically equals a listed impairment.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990).  "For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  But a claimant whose severe impairment satisfies or medically equals a listed impairment is "conclusively presumed to be disabled based on his or her medical condition."  *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Of course, even if a claimant cannot prove that she is disabled at step three, she may do so at steps four and five.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1238–40 (11th Cir. 2004).

## A.

To meet listing 12.05 ("intellectual disability"[2]), "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."  *Crayton*, 120 F.3d at 1219.  These requirements are referred to as the listing's "diagnostic criteria."  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description

[2] Effective September 3, 2013, the Social Security Administration replaced the term *mental retardation* with the term *intellectual disability* as a listed impairment.  Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1).  This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people."  *Id.* at 46,499.  But this change "d[id] not affect the actual medical definition of the disorder or available programs or services."  *Id.* at 49,500.  So while the ALJ, whose decision issued before the change took effect, and the parties use the old terminology, we follow the agency's new nomenclature.

for [intellectual disability].")  In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing.  *See id.* § 12.05.  Under paragraph C, the only paragraph at issue here, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

A *valid* IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability.  *See Hodges v. Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir. 2001).  At the same time, it is well established that such a presumption does not arise where a qualifying IQ score is inconsistent with other record evidence concerning her daily activities and behavior.  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)).  But once the ALJ accepts an IQ score as valid and finds that the claimant's impairments meet or medically equal the other criteria of listing 12.05C, the disability determination cannot be based on the claimant's age, education, or work experience.  *Id.*

In sum, a claimant proves that she meets listing 12.05C by establishing the diagnostic criteria for intellectual disability, including deficits in adaptive functioning; showing onset before age 22; producing a valid, qualifying IQ score; and exhibiting the requisite deficits in work-related functioning.

6

**B.**

Here, Frame injured her neck in 2002 and underwent surgery in January 2003.  She returned to work the next month and continued to work until 2006.  She contends that she became disabled in May 2006 at age 43.  Her disability claim was initially based on the neck injury and resulting surgery, herniated discs, low-back pain, cardiovascular muscle spasms, high blood pressure, and depression.

In April 2009, Frame took a Wide Range Intelligence Test (WRIT) administered by Rick Robinson, a vocational rehabilitation counselor.  Frame received the following scores: verbal (crystallized) IQ of 65, visual (fluid) IQ of 85, and general IQ of 71.  According to the report accompanying her test results, Frame's scores corresponded to intelligence profiles of very low, low average, and borderline, respectively.[3]  The report did not opine about the validity of these scores.

In January 2012, Frame had a hearing before an ALJ on her benefits application.  She testified about her health impairments, memory problems, and limited education.  Dr. Hershel Goren, a neurologist and medical expert, testified that Frame's impairments met the requirements of listing 12.05C because she had a verbal IQ of 65 and additional severe physical impairments.

Two months later, the ALJ denied Frame's benefits application, finding that she was not disabled under the Social Security Act.  The ALJ determined that

---

[3] When multiple IQ scores are derived from a standard general intelligence test in the Wechsler series, the ALJ uses "the lowest of these in conjunction with 12.05."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D6c.  Here, therefore, the relevant score is Frame's verbal (crystalized) IQ of 65.

7

Frame satisfied steps one and two of the sequential review.  That is, she was not engaged in substantial gainful activity and had the following severe impairments: degenerative disc disease of the cervical spine, bipolar affective disorder, neuropathy, pain disorder, borderline intellectual function, and panic attacks.  But despite Dr. Goren's testimony, the ALJ determined that she did not meet the criteria for intellectual disability under listing 12.05C.

At step four, the ALJ determined Frame's residual functional capacity.  And based on a vocational expert's answer to a hypothetical question about a person with characteristics like Frame's, the ALJ found that Frame was not disabled because she could perform her past relevant work.  *See Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999) (explaining that an ALJ may rely solely on the testimony of a vocational expert in making stage-five determination).

## C.

On appeal, Frame does not challenge the ALJ's assessment of her residual functional capacity, nor does she object to the ALJ's reliance on the vocational expert's testimony.  But she does take issue with the ALJ's step-three analysis.  In her view, the ALJ's finding that she does not meet the requirements of listing 12.05 was not supported by substantial evidence.  We disagree.

The ALJ concluded that Frame did not meet the criteria of listing 12.05C because she failed to present a valid, qualifying IQ score.[4]  The ALJ rejected this

---

[4] The ALJ also concluded that Frame had not proven that she met the diagnostic criteria of listing 12.05.  Specifically, the ALJ found that

8

score for two reasons.  First, he found that this score was inconsistent with the findings of Dr. Jeff Gedney, her treating psychologist.  Specifically, in February 2007, Dr. Gedney described Frame's intelligence, global executive function, insight, and judgment as "normal."  In June 2008, he concluded that she did not have a "low IQ or reduced intellectual functioning."  And in May 2009, he characterized her level of dysfunction during the previous month—when she took the IQ test—as only "moderate."[5]  Second, the ALJ noted that the report accompanying her IQ test did not comment on the test's validity.

Although the ALJ's step-three analysis rested on the invalidity of her IQ test, Frame does not argue on appeal that her score is valid.  Instead, she appears to rely on the score's mere existence and the testimony of a nonexamining physician, Dr. Goren.  In any event, we conclude that the ALJ's conclusion—that Frame's IQ score was invalid—was supported by substantial evidence.

there is no evidence that shows significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.  Indeed, there is no evidence of deficits in the development period.  Moreover, [Frame] has a demonstrated history of remarkably good adaptive functioning.  In fact, the record describes her prior occupations wherein she worked full time at different jobs.  In one job, [she] had to select parts in a stock room by using alphanumeric indicators.  In another job, [she] was the leader of a crew and was responsible for making sure the parts were manufactured correctly.  These jobs show significant capabilities and functioning.

Because we conclude that substantial evidence supported the ALJ's finding that Frame's IQ score is invalid, we need not address whether substantial evidence also supported this reason for finding that Frame failed to prove that she met the criteria of listing 12.05.

[5] The ALJ also noted that Frame's IQ score was inconsistent with the conclusions of another examining psychologist, Dr. Linda Abeles.  In November 2006, Dr. Abeles examined Frame and concluded that she exhibited borderline intellectual functioning and that she could likely obtain and maintain employment with appropriate treatment.

9

For starters, the ALJ did not err by considering whether Frame's IQ score was consistent with the other evidence in the record. The regulations provide that the results of standardized intelligence tests "are only part of the overall assessment." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D6a. And while such test results are "essential" for all claims of intellectual disability not covered by listing 12.05A, *id.* § 12.00D6b, the regulations "do[ ] not require the ALJ to make a finding of [intellectual disability] based on the results of an IQ test alone," *Popp*, 779 F.2d at 1499. Indeed, they require the ALJ to "examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior." *Id.* at 1500. So by considering the medical evidence of Frame's examining physicians, the ALJ did not err. Nor did the ALJ err by according little weight to Dr. Goren's testimony that Frame met the criteria of listing 12.05C. *See Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) (concluding that the opinions of reviewing, nonexamining physicians, "when contrary to those of examining physicians, are entitled to little weight"); *see also* 20 C.F.R. §§ 404.1527(d)–(e), 416.927(d)–(e).

Next, the regulations make clear that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." § 12.00D6a. Because a comment about the IQ test's validity is not required, it is unlikely that the ALJ could reject Frame's verbal IQ score on this basis alone. But this does not mean that the report's lack of comment could not factor into his analysis. After all, reports that "[do] not include the quantum of medical evidence

required to document whether the results of the intelligence test were consistent with the plaintiff's daily behavior" are generally given less weight than those that "ma[k]e the required specific findings regarding plaintiff's mental condition, and extensively discuss[ ] her personal and medical history and current lifestyle in support of [their] findings." *Strunk v. Heckler,* 732 F.2d 1357, 1360 (7th Cir. 1984).[6]

## IV.

Given our highly deferential review, we hold that a reasonable person could conclude from the record that Frame's verbal IQ score of 65 was invalid. *See Crawford*, 363 F.3d at 1158–59. Accordingly, we conclude that substantial evidence supported the ALJ's conclusion that Frame did not meet listing 12.05C. And because Frame did not challenge the ALJ's step-four analysis, we affirm the denial of her benefits application.

AFFIRMED.

---

[6] As Frame notes, we have recognized that IQ is presumed to remain fairly constant throughout life. *Hodges*, 276 F.3d at 1268–69. For this reason, we have held that a valid IQ score after age 22 creates a rebuttable presumption that the claimant satisfies the diagnostic criteria of listing 12.05. *See id.*

But contrary to Frame's suggestion, *Hodges* does not apply here. In that case, the ALJ accepted the IQ score determined by the examining physician "as a valid assessment of Hodges' mental capabilities at age 49." *Id.* at 1268. Not so here. Thus, the ALJ did not err by failing to presume that Frame satisfied the diagnostic criteria of listing 12.05.